**This order is SIGNED.**





**Dated: December 20, 2017** _____

**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | |
| STEVEN LYLE MAY and BOBBIE JEAN MAY, | Bankruptcy Number: 13-24002 |
| Debtors. | Chapter 7 |
| | |
| REPEREX, INC., a Utah Corporation, BRAD BALL, and DAVID BALL, | Adversary Proceeding No.13-2360 |
| Plaintiffs, | |
| v. | Honorable R. Kimball Mosier |
| STEVEN LYLE MAY and BOBBIE JEAN MAY, | |
| Defendants. | |

## MEMORANDUM DECISION

Brad Ball was looking for a business to buy. With the assistance of his father, David Ball,

they bought May's Custom Tile from Steven May in August 2008. Business did not go well for the

Balls and they ended up blaming May and filed a lawsuit claiming that the company was

underperforming because May had misrepresented its financial condition. May had another business, May's Granite, and business didn't go well for him either. He and his wife Bobbie (collectively, the Mays or Defendants) filed bankruptcy in April 2013, and the Balls commenced the above-captioned adversary proceeding alleging causes of action under 11 U.S.C. §§ 523(a)(2), (a)(6), 727(a)(2), (a)(3), (a)(4), and (a)(5).[1] After four days of trial and after the Balls had been fully heard on all issues, the Defendants moved for judgment on partial findings. The Court permitted briefing on that motion and conducted a hearing on it on July 20, 2017. After considering the parties' briefs and oral arguments, reviewing and weighing the evidence presented at trial, and conducting an independent review of applicable law, the Court issues the following Memorandum Decision granting the Defendants' motion.[2]

## I. JURISDICTION

The Court's jurisdiction over this adversary proceeding is properly invoked pursuant to 28 U.S.C. § 1334 and § 157(b)(1). Actions to except particular debts from discharge and to deny a debtor's discharge are core proceedings within the definition of 28 U.S.C. § 157(b)(2)(I) and (J), and the Court may enter a final order. Venue is appropriate under 28 U.S.C. § 1409.

---

[1] All subsequent statutory references are to title 11 of the United States Code unless otherwise indicated.

[2] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a) and (c), made applicable in adversary proceedings by Fed. R. Bankr. P. 7052. Any of the findings of fact herein are deemed, to the extent appropriate, to be conclusions of law, and any conclusions of law are similarly deemed, to the extent appropriate, to be findings of fact, and they shall be equally binding as both.

## II. FINDINGS OF FACT

Steven May founded May's Custom Tile, Inc. (Tile) in 1987 and was its owner and president. Tile performed commercial and high-end residential tile work in northern Utah. May founded a second company, May's Granite, LC (Granite), in 2002 and was its manager, registered agent, and organizer. Granite was organized under the Utah Revised Limited Liability Company Act as a manager-managed limited liability company. Tile and Granite shared office space that was located above a showroom within a warehouse. In 2007, May suffered a heart attack and undertook efforts to sell Tile and Granite by listing them with Coldwell Banker Commercial through one of its agents, Duane Bush. Tile was marketed as a non-recurrent revenue business, meaning that an operator of the business would have to find new clients on a regular basis to generate revenue.

Brad Ball enrolled in an MBA program with a scheduled graduation date in 2008. In mid-2007, halfway through the program, he began to search for a business to purchase by looking through financial statements given to him by the businesses and their brokers. In late June or early July 2008, he found Tile and Granite. Ball informed his father, David Ball (collectively with Brad Ball, the Balls or Plaintiffs), about Tile and enlisted him to help vet the company and finance its purchase. The Balls did not hire an accountant or business valuation expert to assist them in examining Tile's financial information, and they did not hire an attorney to help with the purchase of the business.

During July and August 2008, the Balls met with Duane Bush approximately six times and began reviewing some of Tile's records, including a business opportunity brochure prepared by Bush (Ex. 71) and Tile's 2006 and 2007 tax returns (Exs. 1 and 2). The Balls also claim to have reviewed accounts receivable aging reports dated March 3, 2008 and April 24, 2008 (Exs. 20 and 22), Tile's sales by customer summary for January through December 2007, dated March 4, 2008 (Ex. 81)

Tile's sales by customer summary for January through February 2008, dated February 29, 2008 (Ex. 80), and Tile's profit and loss statement for January 1 through April 29, 2008, dated April 29, 2008 (Ex. 27). After reviewing this information, the Balls agreed that Tile "looked excellent" based on its sales numbers, appeared healthy and profitable, had a good net adjusted income to price ratio, and "fit the bill perfectly from a financial perspective." After exchanging rounds of offers and counteroffers, the Balls and May eventually came to an agreement for the purchase of Tile (Asset Sale Agreement).

Before reaching that agreement, however, Ball sent Bush an email on July 17, 2008 wherein he asked questions about Tile's accounts receivable, including whether Tile had "any collections issues."[3] Bush responded the next day and said that while Tile has "no major issues on collections," he elaborated that Tile has "had bad debt from time to time, mostly when no one is paying attention to collections / who they give credit to. This is an area that can definitely be tightened up and Steve has said that."[4]

On August 11, 2008, the Balls met with Steve May and Russ Bradshaw, the accountant for Tile and Granite, for a final due diligence meeting where they could review documents and ask questions of May and Bradshaw. The Balls asked to review all the invoices from January through July 2008 and saw a number of reports.[5]  During that meeting, David Ball "saw a large credit for $129,000 that was unusually large," and he looked at Steve May and asked what was going on with

---

[3] Ex. 70.

[4] *Id.*

[5] Trial Transcript for June 5, 2017, at 176:9-12.

the credit.[6] May responded that he didn't know but would check with his bookkeeper. Although the Balls claim to have seen a $129,000 credit, they did not identify the document they were looking at when they "saw" it. The Balls deny that they saw Tile's general sales ledger,[7] which is the only document identified by the parties that mentions a $129,000 credit.[8] Immediately after this meeting, Tile's general sales ledger was faxed to Bradshaw's office. The following day, Bradshaw reviewed that ledger and discovered that Marie Christiansen, Tile's bookkeeper, had mistakenly posted approximately $230,000 in unpaid accounts receivable from 2006 and 2007—which included a $129,000 invoice to Inklyne Construction—to Tile's general sales ledger on March 3, 2008. On August 14, 2008, Bradshaw sent an associate from his accounting firm to Tile who made a journal entry that removed the unpaid accounts receivable from the general sales ledger and posted them as a bad debt expense.

The Inklyne Construction credit constituted a "red flag"[9] for the Balls, and they felt they "needed to get to the bottom of that."[10] The Balls had no further discussions with May about the credit, but a day or two after the due diligence meeting, David Ball received a phone call from Duane

---

[6] *Id*. at 177:5-7.

[7] *Id.* at 179:7-180:5. The general sales ledger is Ex. 66.

[8] It is possible that the Balls saw the $129,000 credit by viewing exhibit 68, which is a credit memo dated March 3, 2008 in the amount of $129,008.10. The credit memo refers to an account with Inklyne Construction and could have been included in the invoices that the Balls reviewed at the due diligence meeting. During the course of a discussion regarding exhibit 66, the Balls' attorney abruptly referred to exhibit 68, and it is unclear whether he meant to refer to exhibit 66. *See* Trial Transcript for June 5, 2017, at 182:16-183:12. But he never referred to exhibit 68 again and never offered it into evidence.

[9] Trial Transcript for June 5, 2017, at 54:7-12.

[10] *Id.* at 61:14-17.

Bush about the credit. According to Ball, the explanation Bush gave him regarding the Inklyne credit was that "it was some improperly done invoice they had to credit off and redo again."[11] Although this explanation is extremely vague, the Balls did not inquire further about the Inklyne credit.

On August 18, 2008, the Balls, through Reperex, Inc., a company they had created, bought Tile. The Asset Sale Agreement provided that Reperex could use Steve May's contractor's license for 60 days but thereafter the Balls had to qualify for and obtain their own contractor's license.[12] There was no evidence that the Balls ever attempted to obtain their own contractor's license. The Balls took possession of Tile the next day and began to operate the business. Granite and Reperex also entered into an Agreement for Lease of Employees (Employee Lease) whereby Granite agreed to provide Reperex with the services of two of its salespeople, Jason Johns and Kristy Larsen, to assist in obtaining sales for Tile. The Employee Lease provides that the leased employees "will devote 35% of their time and attention" to working for Tile. The Employee Lease could be terminated by either party after 45 days' written notice to the other party.

Neither Brad nor David had any experience in the construction industry in general or the custom tile business in particular. David had purchased a residential bathroom remodeling and antique bathtub refinishing business in 1998. He owned the business for about three years and worked there for approximately six months. In his own estimation, his experience with that company did not qualify him to run a tile company.

At the time the Balls bought Tile, Brad knew the economy was in a mild recession, but he viewed this as an opportunity because it might cause a business seller to accept less. David knew that

---

[11] *Id.* at 183:3-6.

[12] Ex. 92, at 12-13.

6

the economy was slowing down, but he believed it had reached the bottom. Due to the Balls' concern

with the economy, they negotiated a provision in the promissory note for the purchase of Tile that

would automatically renew the note for twelve months if they were not able to refinance it within

a year. Brad testified that the economy fell off a cliff in September and October 2008.

On August 20, 2008, Brad made an unremarkable entry in his journal noting that Promontory,

a luxury subdivision near Park City that was one of Tile's larger clients in 2007 and early 2008, had

declared bankruptcy a few months earlier.[13] Brad mentions Promontory only once more in his

journal—on September 19, 2008—when he notes that he and Steve May went up to the Promontory

development.

Business began to slow down after the Balls bought Tile, and cash flow diminished.[14]

Although new jobs appeared on the horizon,[15] the business continued to struggle and one of the jobs

was losing Tile money.[16] A new job provided a brief respite, but it faltered when the tile for the job

was delayed by two months.[17] Tile's financial condition grew more precarious as 2009 advanced and

banks became less willing to offer loans.[18] On March 20, Brad noted that "the end could be near for

the business."

---

[13] Ex. 60, at August 20, 2008 entry. The parties stipulated to the introduction of Brad Ball's personal journal.

[14] *Id.* at entries for Oct. 20-22; Nov. 3-5, 7, and 10-11, 2008.

[15] *Id.* at entries for Oct. 20; Nov. 13, 20; Dec. 4, 19, 22, and 29, 2008; Jan. 16, 22, and 26, 2009.

[16] *Id.* at entries for Jan. 6-7, 9, 15-16, 23, 29; Feb. 3-4, 6, and 17, 2009.

[17] *Id.* at entries for Feb. 19; Mar. 2, and 12, 2009.

[18] *Id.* at entries for Mar. 12-13, and 18-19, 2009.

7

In his journal entry for January 13, 2009, Brad expressed frustration that Tile was not as profitable as he thought it would be. Two days later, he made the same observation, concluding that the economy must be partially responsible, but also suggesting for the first time that he and his father might have been misled in the purchase of the business.

In the months after the Balls bought Tile, tensions gradually rose between them and Steve May.[19] By February 16, 2009, Brad noted that if he "could walk away from [Tile] right now and come out even," he would do so. The same day he explored options to sell Tile and contemplated buying another company. On February 20, Brad wrote that it "would be nice to go back to last summer and unwind th[e] deal" for the purchase of Tile and "it would be great to find a way out of this deal and move onto [sic] something else." By March 4, Brad was looking for an exit strategy to get out of Tile, and by March 20, he had discussed it with David.

On March 30, the Balls offered to sell Tile back to May, and they resumed negotiations on April 6. May rejected the Balls' offer on April 15. On April 18, the Balls met with Alex Mismash to gauge his interest in becoming a partner in Tile. The Balls hired Mismash in late April to run Tile in place of Brad, who had initially handled the day-to-day management of Tile since the Balls bought the business, but had been spending less and less time there beginning in late March. Mismash began working at Tile on May 1. He was at the business two or three days a week and always had a key to the office. He worked at Tile for about a month until David Ball told him there was no need to come to work anymore. After Brad's involvement in Tile decreased in March and April 2009, David gradually took on a larger role in the business, especially after Mismash started, when David assisted him with the company's books and accounting.

---

[19] *Id.* at entries for Nov. 25, 2008; Jan. 13, 23, 27; Feb. 3, 9, 12, 25; and Mar. 18, 2009.

On April 23, May changed the locks on the building where Tile was located. Brad arrived at the business between 5:30-6:00 p.m. to find that he could not gain access to the building. The Balls did continue to have access to the premises during regular business hours. On April 29, the Balls received written notice of default under the Asset Sale Agreement and were given 30 days to cure.[20] One of the defaults identified in the notice was the Balls' failure to obtain a contractor's license within 60 days of the closing as required by the Asset Sale Agreement. The Balls left Tile on May 29, 2009.

Bradshaw prepared Tile's 2007 and 2008 tax returns. In preparing the 2007 tax return, Bradshaw went through Tile's accounting records to ensure that the numbers on the return were accurate, including the apportionment of a rent expense between Tile and Granite. With respect to the 2008 tax return, Bradshaw advised Steve May that Tile could claim a deduction for bad debt that arose in 2006 and 2007.[21] Bradshaw's opinion was that Tile could amend its prior return, but it would also be appropriate to take a deduction for this bad debt on Tile's 2008 tax return.

The Great Recession hit Granite hard, reducing its business by 50% in 2008.[22] The Mays cashed life insurance policies, withdrew all of their retirement funds, took out a second mortgage on their home, and maxed out their credit cards, all in an effort to keep Granite afloat.[23] The Mays filed a chapter 13 petition on April 12, 2013. They voluntarily converted their case to one under chapter 7 on June 24, 2013.

---

[20] *See* Ex. 83.

[21] Trial Transcript for June 6, 2017, at 262:2-263:11.

[22] Trial Transcript for June 8, 2017, at 556:25-557:2.

[23] *Id.* at 559:1-560:5.

### III. CONCLUSIONS OF LAW

After the Plaintiffs rested their case, the Defendants orally moved to dismiss the amended complaint. The Court confirmed that the Defendants were seeking judgment on partial findings pursuant to Fed. R. Civ. P. 52(c).[24] That rule states in relevant part:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence.[25]

Although Rule 52(c) parallels judgment as a matter of law under Rule 50(a) in their timing during a trial—motions under both rules are made after a party has been fully heard on an issue—the standards applicable to these rules differ significantly. The difference stems from who the trier of fact is in the case. Rule 50(a) applies to jury trials, where the jury serves as the trier of fact. "Because the district judge lacks the authority to resolve disputed issues of fact under those circumstances, judgment as a matter of law is appropriate only if no reasonable jury could find for a party on that claim."[26] Accordingly, a court evaluating a Rule 50(a) motion "must draw all reasonable evidentiary inferences in favor of the non-moving party."[27]

---

[24] *See Roth v. Am. Hosp. Supply Corp.*, 965 F.2d 862, 865 n.2 (10th Cir. 1992) ("Effective December 1, 1991, a motion to dismiss an action at the close of the plaintiff's evidence in a bench trial should be treated as a motion for judgment on partial findings as provided in Rule 52(c), as amended."). All subsequent references to rules are to the Federal Rules of Civil Procedure unless otherwise indicated.

[25] Fed. R. Civ. P. 52(c).

[26] *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006).

[27] *Id.*

10

The non-moving party gets no such benefit under Rule 52(c), however.[28] Since Rule 52(c) applies to bench trials, where the judge is the trier of fact, the judge may properly exercise his or her role in resolving disputed issues of fact. Therefore, in considering a Rule 52(c) motion, "the trial court is not required to consider the evidence in the light most favorable to the plaintiff, but instead must undertake the fact finding process which involves a weighing of the evidence and an assessment of the credibility of the witnesses to determine whether or not the plaintiff has demonstrated a factual and legal right to relief."[29] In short, the court "applies the same standard of proof and weighs the evidence as it would at the conclusion of the trial" but "does not view the evidence through a particular lens or draw inferences favorable to either party."[30]

The Plaintiffs' amended complaint asserts six claims: §§ 523(a)(2)(A), 523(a)(6), 727(a)(2), 727(a)(3), 727(a)(4), and 727(a)(5). To prevail on any one of these claims, the Plaintiffs must prove each element of that claim by a preponderance of the evidence.[31] It follows that failure to prove a

---

[28] *See* Fed. R. Civ. P. 52 advisory committee's note to 2007 amendment ("The standards that govern judgment as a matter of law in a jury case have no bearing on a decision under Rule 52(c).").

[29] *Roth*, 965 F.2d at 865 (citations and internal quotation marks omitted) (addressing Rule 41(b), Rule 52(c)'s predecessor); *see also Ritchie*, 451 F.3d at 1023 ("In deciding whether to enter judgment on partial findings under Rule 52(c), the district court is not required to draw any inferences in favor of the non-moving party; rather, the district court may make findings in accordance with its own view of the evidence."); *Follett Higher Educ. Grp., Inc. v. Berman*, 427 B.R. 432, 434 n.1 (N.D. Ill. 2010) ("A motion under Rule 52(c) is not the same as a motion for a directed verdict. The court neither draws special inferences in the nonmovant's favor, nor considers the evidence in the light most favorable to the nonmovant. Because the court is the finder of fact in a bench trial, . . . the bankruptcy judge has discretion on a Rule 52(c) motion to weigh evidence and determine credibility.").

[30] *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 272 (3d Cir. 2010).

[31] *Grassman v. Brown (In re Brown)*, 570 B.R. 98, 109 (Bankr. W.D. Okla. 2017) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991) and *First Nat'l Bank of Gordon v. Serafini (In re*

single element of a claim will result in judgment for the Defendants on that claim. "[E]xceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."[32] Nevertheless, "the opportunity for 'a completely unencumbered new beginning' is reserved only for 'the honest but unfortunate debtor.'"[33]

## A.    The § 523(a)(2) Claim

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[34] False pretenses, false representation, and actual fraud each provide a separate and independent basis for nondischargeability under § 523(a)(2)(A).[35] The pith of the Balls' allegations under this section is that the Mays misrepresented Tile's profits and concealed significant bad debt by shuffling it around on the company's books. In particular, the Balls assert that the Mays made false representations in connection with the sale of Tile through the following documents: Tile's 2006 and 2007 tax returns; accounts receivable aging reports for Tile as of March 3, 2008 and April 24, 2008; and an email from Duane Bush to Brad Ball wherein Bush stated that Tile had "no major

---

*Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991)).

[32] *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997) (citation omitted); *see also Bank One v. Kallstrom (In re Kallstrom)*, 298 B.R. 753, 758 (10th Cir. BAP 2003) ("Because of the importance of the discharge in bankruptcy, the grounds for denying a discharge as set forth in subsections (1) through (10) of § 727(a) are narrowly construed.").

[33] *Standiferd v. U.S. Trustee*, 641 F.3d 1209, 1212 (10th Cir. 2011) (quoting *Grogan*, 498 U.S. at 286-87).

[34] § 523(a)(2)(A).

[35] *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 691 (10th Cir. BAP 2013).

12

issues" with collecting accounts receivable. In addition, the Balls allege that Steve May made false

oral representations when he told the Balls during meetings that Tile was going strong and business

was coming in at the same rate.

The problem for the Balls is that these documents and oral representations are not actionable

under § 523(a)(2)(A). That subparagraph expressly does not apply to statements respecting a debtor's

or an insider's financial condition. Statements respecting financial condition "are those that purport

to present a picture of the debtor's overall financial health."[36] Illustrative examples "include those

analogous to balance sheets, income statements, statements of changes in overall financial position,

or income and debt statements that present the debtor or insider's net worth, overall financial health,

or equation of assets and liabilities."[37] Tax returns also fall within this category.[38] The documents

and oral representations on which the Plaintiffs base their § 523(a)(2)(A) claim concern Tile's

overall financial health. And since Tile is an insider of the Mays,[39] the documents are actionable, if

at all, only under § 523(a)(2)(B). The oral statement is not actionable under either § 523(a)(2)(A) or

(a)(2)(B).[40]

---

[36] *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 714 (10th Cir. 2005). The Plaintiffs assert that *Joelson* is "completely inapposite" because it involved a loan rather than the purchase of a business. The Court fails to see why that fact would render *Joelson* inapplicable in this case.

[37] *Id.*

[38] *Banner Bank v. Robertson (In re Robertson)*, 570 B.R. 352, 362 (Bankr. D. Utah 2017) (collecting cases).

[39] *See* § 101(31)(A). Where the debtor is an individual, as in this case, an insider of the debtor includes a "corporation of which the debtor is a director, officer, or person in control." Tile is a corporation, and Steve May was the president of, and held an ownership interest in, that corporation during the events relevant to this case.

[40] *See In re Joelson*, 427 F.3d at 704 ("If a debt is obtained by a false *oral* 'statement respecting the debtor's [or an insider's] financial condition,' the debt *is* dischargeable.").

13

At the outset of trial, the Court addressed the Plaintiffs' apparent failure to plead the correct cause of action.[41] But the Plaintiffs never formally moved to amend the complaint under Rule 15(b), although the Defendants indicated that they would object to such a motion if the Plaintiffs filed one. Nevertheless, Rule 15(b)(2) provides that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."[42] Amendment under Rule 15(b)(2) does not require a motion, and "a court may enter judgment on an unpleaded claim even without a formal amendment to the pleadings so long as the parties expressly or impliedly consented to trial of the issue."[43] Under Tenth Circuit precedent, "[a] party impliedly consents to the trial of an issue not contained within the pleadings either by introducing evidence on the new issue or by failing to object when the opposing party introduces such evidence."[44]

The Court concludes that the parties impliedly consented to trial of the § 523(a)(2)(B) claim. During trial the Plaintiffs presented written statements, such as Tile's 2006 and 2007 tax returns, that are plainly not relevant to a § 523(a)(2)(A) claim, but are particularly relevant to a § 523(a)(2)(B) claim. But the Defendants failed to object to the admission of such evidence. By failing to object, the Defendants gave their implied consent to trial of the unpleaded § 523(a)(2)(B) claim.

Section 523(a)(2)(B) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

---

[41] *See* Trial Transcript for June 5, 2017, at 8:11-9:14, 26:9-27:9.

[42] Fed. R. Civ. P. 15(b)(2).

[43] *Harris N.A. v. Gunsteen (In re Gunsteen)*, 487 B.R. 887, 903 (Bankr. N.D. Ill. 2013).

[44] *Eller v. Trans Union, LLC*, 739 F.3d 467, 479 (10th Cir. 2013) (quoting *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1280 (10th Cir. 2004)).

14

. . . .

(B) use of a statement in writing—

    (i) that is materially false;

    (ii) respecting the debtor's or an insider's financial condition;

    (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

    (iv) that the debtor caused to be made or published with intent to deceive."

With respect to each alleged false statement, the Balls failed to establish several of the elements of their § 523(a)(2)(B) claim, namely, that the statements were materially false, that the Balls' reliance was reasonable, and that the Mays made these statements with the intent to deceive.

In order for a statement to be materially false, it must "paint[] 'a substantially untruthful picture of an entity's financial condition that objectively would, and subjectively did, affect a creditor's decision to pay money to a debtor."[45] "A statement may be rendered materially false either by an affirmative misrepresentation, or by omission."[46] But in order for an omission to be actionable under § 523(a)(2)(B), "the party privy to the omitted information must have been obligated to furnish it."[47]

---

[45] *JD Invs. of Utah, LLC v. Hanson (In re Hanson)*, No. 12-2219, 2014 WL 2548100, at *6 (Bankr. D. Utah June 5, 2014) (collecting cases).

[46] *Privitera v. Curran (In re Curran)*, 855 F.3d 19, 25 (1st Cir. 2017) (citations omitted).

[47] *Id.* at 25-26 (citation omitted).

15

Reliance under § 523(a)(2)(B)(iii) must be actual reliance,[48] and whether reliance is reasonable is measured by an objective standard.[49] It is a facts-and-circumstances inquiry in which "a bankruptcy court may consider, among other things, whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any 'red flags' that would have alerted an ordinarily prudent buyer to the possibility that the representations actually relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations."[50] In short, this "standard of reasonableness places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon [the] debtor's representations."[51] The reasonable reliance standard is more demanding than the justifiable reliance standard found in § 523(a)(2)(A).[52] Whether a creditor's reliance is justifiable is a subjective inquiry, which requires a court to "examine 'the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than applying a community standard of conduct to all cases.'"[53] But "this test 'does not leave objective reasonableness irrelevant, for the

---

[48] *First Nat'l Bank v. Cribbs (In re Cribbs)*, 327 B.R. 668, 674 (10th Cir. BAP 2005).

[49] *Cyprus Credit Union v. Dehlin (In re Dehlin)*, No. 09-2176, 2011 WL 1261623, at *6 (Bankr. D. Utah Mar. 31, 2011).

[50] *In re Hanson*, 2014 WL 2548100, at *6 (citation and internal quotation marks omitted).

[51] *Leadership Bank, N.A. v. Watson (In re Watson)*, 958 F.2d 977, 978 (10th Cir. 1992) (citation and internal quotation marks omitted).

[52] *GDO Invs., Inc. v. Glasgow (In re Glasgow)*, 370 B.R. 362, 372 (Bankr. D. Colo. 2007).

[53] *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 791-92 (10th Cir. 2009) (quoting *Field v. Mans*, 516 U.S. 59, 71 (1995)).

16

greater the distance between the reliance claimed and the limits of the objectively reasonable, the greater the doubt about reliance in fact.'"[54]

A debtor's intent to deceive will rarely exist in the form of direct evidence. Instead, "[i]ntent to deceive may be inferred from the totality of the circumstances, including a reckless disregard for the truth."[55]

### 1. Tile's 2006 Tax Return and 2008 Aging Reports

The Court elects to address Tile's 2006 tax return and the 2008 aging reports collectively because they are at the core of the Plaintiffs' allegation that the Mays hid $230,000 in bad debt. The Plaintiffs' narrative of events begins with Tile's 2006 tax return and their claim that "[t]here was in excess of $200,000.00 in bad debt on which the Mays paid taxes in 2006."[56] The Balls contend that Tile did not collect on approximately $230,000 of its accounts receivable in 2006, failed to take that fact into account on its 2006 tax return, and as a result paid taxes on that bad debt. Then, on March 3, 2008, Tile entered those unpaid accounts receivable on its general sales ledger as credits,[57] and on March 3 and April 24, 2008, Tile generated accounts receivable aging reports that did not include the $230,000 in unpaid accounts receivable. The Balls assert that the Mays removed those accounts

---

[54] *Id.* at 792 (quoting *Field*, 516 U.S. at 76).

[55] *In re Cribbs*, 327 B.R. at 673 (citing *Grogan*, 498 U.S. at 291).

[56] Docket No. 150, at 2.

[57] The Balls repeatedly brought up allegations of backdating, *see* Trial Transcript for June 6, 2017, at 295:4-302:22 and Docket No. 150, at 3, but they never made clear what was supposedly backdated or introduced any evidence to show backdating. Ultimately, the Balls failed to explain—and the Court cannot discern on its own—why the issue of backdated entries would be material to this case. Since backdating is not material to the resolution of the case and there is no evidence on the matter, the Court will not address it further.

from the aging report on March 3 and shunted them over to the general sales ledger so that Tile would appear to carry relatively little bad debt.[58] After the Balls bought Tile, the Mays took a deduction for some unpaid accounts receivable on Tile's 2008 tax return instead of going back and amending the 2006 return. To the Balls, this choice to take the deduction in 2008 is strong evidence of the Mays' intent to deceive. The Balls contend that the Mays knowingly overstated Tile's sales numbers and waited until after the sale was complete to reap the benefits of that overstatement. The Balls further assert that the Mays chose to take the bad debt deduction in 2008—even though taking the deduction in 2006 would have been better for them financially—because they wanted to keep the details of their fraud concealed. In sum, the Balls argue that Tile's 2006 tax return inflated Tile's income by including the unpaid accounts receivable, while the 2008 aging reports removed those accounts receivable, and both acts were done in an effort to make Tile appear more desirable.

The evidence does not support the Balls' fraud claim. In the first instance, the Balls did not show that Tile's 2006 tax return or the 2008 aging reports were materially false. With respect to the tax return, the Plaintiffs presented no evidence to demonstrate that the return had been prepared improperly or that it was not the one that had been filed with the IRS. In addition, they did not show that the sales were overstated, how the unpaid accounts receivable should have been reflected on the tax return, or that they must have been reflected on the tax return. As regards the 2008 aging reports,

---

[58] The Balls made contradictory arguments on this point, at one point acknowledging during the Rule 52(c) hearing that the aging report had not been changed. A matter of minutes later, however, the Balls contended that the March 3 aging report would have shown the $230,000 in bad debt had Tile's books not been "manipulated" on March 3. The Court interprets the Balls' argument to be that the $230,000 in unpaid accounts receivable were removed from the aging report on March 3.

18

the Plaintiffs failed to provide any evidence that proper accounting procedures required the unpaid

accounts receivable to be included in the aging reports even though they were nearly two years old.

The Plaintiffs also failed to establish that their reliance was justifiable, much less reasonable.

Brad Ball testified that Tile's profits were critical to the Balls' evaluation of whether to purchase the

business, they relied on Tile's 2006 tax return and other documents to assess its financial health, and

if they had known about these unpaid accounts receivable they would not have chosen to buy Tile.

The Court doesn't find this testimony credible. Other than their self-serving statements, the Balls did

not even attempt to articulate any reasons why these unpaid accounts receivable would be so

important to their decision to purchase Tile. Tile was marketed as a non-recurrent revenue business.

That is clear notice to potential buyers that future business is not based on returning customers, so

a poor-paying customer should not be relevant to the company's ability to collect on its accounts

going forward. These unpaid accounts were nearly two years old at the time the Balls were

conducting their due diligence, and the reason for non-payment on the Inklyne account was a

contract dispute.

But more importantly, there was no reasonable reliance on the alleged failure to disclose the

unpaid accounts because the Plaintiffs knew about the credit memos, which revealed the unpaid

accounts, prior to purchasing the company. The Balls testified that they learned of the Inklyne

"credit" or "anomaly" when they "saw" it at the due diligence review of Tile's financial documents.[59]

The Balls did not identify the document they reviewed that disclosed the Inkylne credit, but they

claim it was not exhibit 66, i.e., Tile's general sales ledger. Exhibit 66 reveals that there were six

other credits posted to Tile's general sales ledger on the same day as the Inklyne credit. The Balls

---

[59] Trial Transcript for June 5, 2017, at 54:6-12, 177:5-7.

have failed to explain how they "saw" the Inklyne credit but not the other credits. Bradshaw testified

that "there was a question about the credit *memos*" at the due diligence meeting,[60] and based on that

testimony the Court concludes that the Balls saw more than just the Inklyne credit memo.[61] The

Court does not find the Balls' claim of ignorance of the other unpaid accounts to be credible.

But whether the Balls saw all the credit memos or just the Inklyne credit memo, the analysis

is the same. The Balls testified that the only issue that concerned them was the Inklyne credit. They

considered that credit a "red flag" and felt that they "needed to get to the bottom" of the issue.[62] They

asked Steve May and Bradshaw about the Inklyne credit at the due diligence meeting. May and

Bradshaw did not know what it was, but Bradshaw said he would find out. Bradshaw asked for Tile's

general sales ledger, and after reviewing it on August 12, he understood what the answer was.[63] The

explanation David Ball received from Duane Bush was that the Inklyne credit was "some improperly

done invoices they had to credit off and redo again."[64] The Balls were apparently satisfied with this

vague response and did not inquire further about the Inklyne credit. Importantly, although the

explanation as testified to by David Ball is vague, it was not a false representation.

---

[60] Trial Transcript for June 6, 2017, at 277:15-16 (emphasis added).

[61] As noted in footnote 8, *supra*, exhibit 68 was never offered into evidence, so the Court cannot conclude that the Balls saw that specific document at the due diligence meeting. But based on Bradshaw's testimony, the Balls saw credit memos of some kind, including one concerning Inklyne.

[62] Trial Transcript for June 5, 2017, at 54:6-9, 61:14-17.

[63] Trial Transcript for June 6, 2017, at 277:21-278:9.

[64] Trial Transcript for June 5, 2017, at 183:3-6.

At the closing of the sale, the Balls agreed to waive any remaining conditions to closing, thereby essentially acknowledging that they had completed their due diligence to their satisfaction.[65] Having identified the Inklyne credit as a potential problem, the Balls cannot blithely profess that they were duped by the Mays' concealment of the unpaid accounts when they failed to resolve the very issue they identified. Despite identifying the Inklyne credit as a red flag and admitting that they needed to get to the bottom of that issue, the Balls acknowledged that they could have done more due diligence.[66] If the Inklyne credit was an important issue to the Balls, they should have continued to investigate it until they had a satisfactory answer, and that answer was readily available six days before they bought Tile. It is clear from the evidence that Bush's explanation of the Inklyne credit satisfied the Balls' concerns. With the Balls' acknowledgment that Bush gave them an explanation regarding the Inklyne credit, the conclusions one can draw are limited. Either the Balls actually received more information from Bush about the Inklyne credit and proceeded to purchase Tile, or they failed to ask any clarifying questions about the Inklyne credit—despite identifying it as a red flag—and proceeded to purchase Tile anyway. In other words, when the Balls bought Tile they either knew the details about the Inklyne credit they now complain were concealed from them, or they didn't know the details because they failed to ask any clarifying questions, or they needed no additional information because the Inklye credit was not really that important to them. In any instance, their reliance was not justified, let alone reasonable.

The evidence also clearly shows that the Mays did not intend to deceive the Balls by concealing the unpaid accounts. In the first place, the unpaid accounts were not concealed because

---

[65] *See* Ex. 92, at CB0041; Trial Transcript for June 7, 2017, at 413:16-17.

[66] Trial Transcript for June 7, 2017, at 413:13-15.

they were clearly contained in Tile's general sales ledger at the time of the due diligence meeting. Because the Balls raised a question about the Inklyne credit at the due diligence meeting, immediately afterward Bradshaw investigated the credits on the general sales ledger and discovered that Marie Christiansen, Tile's bookkeeper, had mistakenly posted them on the general sales ledger on March 3, 2008.[67] The largest was the $129,008.10 invoice to Inklyne Construction, accounting for over half of the unpaid accounts receivable in dispute. Bradshaw realized that the unpaid accounts receivable should be characterized as bad debts, and on August 14 he sent a staff member to Tile who made a journal entry that removed the unpaid accounts receivable from the general sales ledger and posted them as a bad debt expense. There is no evidence that the Mays intended to conceal the unpaid accounts. They were improperly posted, but there was no evidence that the improper posting was intentional or that it was done at the Mays' request.

The Balls' argument that the Mays had the intent to deceive rests on the tacit premise that the Mays had developed a plan to defraud a potential buyer of the business long before Brad Ball even discovered Tile in late June or early July 2008. The Mays' intended scheme would have had to begin with the preparation of Tile's 2006 tax return and the deliberate overstatement of taxable income, then proceed to posting unpaid accounts receivable on the general sales ledger and generating aging reports on March 3 and April 24, 2008 to conceal those unpaid accounts. To believe the Balls' version of events is to conclude that these actions were part of the Mays' plan in setting a trap for an unwary buyer.

---

[67] *See* Ex. 6, at CVB000511. Posting these unpaid accounts receivable to the general sales ledger was incorrect because they were from 2006 and 2007, whereas the ledger was for 2008. Bradshaw testified that invoices from prior years should not be used to reduce current-year sales. Instead, a negative entry should only be posted to a sales ledger if the entry is a current-year invoice that is being reversed. Trial Transcript for June 6, 2017, at 331:11-332:2.

22

But the evidence simply does not support such a conclusion. There was no evidence that the Mays believed that Tile's 2006 tax return was improper when filed or when shown to the Balls. The Balls failed to establish that any of the accounts at issue could have been, let alone should have been, deducted when Tile's 2006 tax return was prepared. There was no evidence that Marie Christiansen posted the unpaid accounts receivable to the general sales ledger to conceal them from a potential buyer; to the contrary, the evidence showed that she did not know the proper accounting procedure to handle them and posted them to the ledger by mistake. In addition, the Balls' assertion of the Mays' intent to deceive is contradicted by evidence that in August 2008 Steve May requested that Bradshaw's firm verify that Tile's records were accurate.[68]

The Balls also emphasized the Mays' actions after the sale as demonstrating their intent to deceive. According to the Balls, after the Mays hid the 2006 unpaid accounts receivable from the Balls during the sale process, they proceeded to take a tax deduction for those unpaid accounts receivable on their 2008 return. The Balls further argue that the Mays should have amended their 2006 return, but took the deduction in 2008 to draw as little attention to the 2006 return as possible. Again, none of these allegations are supported by the evidence. The Plaintiffs produced no evidence that the Mays discovered the unpaid accounts receivable in time to deduct them on Tile's 2006 return. In fact, Bradshaw testified that when he was preparing Tile's 2007 return, he had no cause to believe that Tile's 2006 return was not accurate.[69] Based on when Bradshaw discovered the issue, the earliest the Mays could have taken the deduction was on Tile's 2008 return.[70] Accordingly, the

---

[68] Trial Transcript for June 6, 2017, at 329:15-21.

[69] *Id.* at 255:4-7.

[70] *Id.* at 259:10-16, 262:2-8.

23

timing of the deduction does not give rise to an inference that the Mays intended to deceive the Balls.

Nor does the fact that the Mays chose to take a deduction in 2008 rather than amend the 2006 return.

The argument that the Mays would draw more attention to the issue by amending Tile's 2006 return

does not find support in the evidence. The Balls did not articulate, much less prove, how amending

the 2006 return would have made the unpaid accounts receivable issue more conspicuous compared

to taking the deduction in 2008. There is nothing to show that the Mays attempted to conceal the

unpaid accounts receivable by choosing not to amend Tile's 2006 return.

In sum, based on the facts and circumstances of the case, the Court concludes that the Balls

have failed to show that Tile's 2006 tax return or the 2008 aging reports were false, that the Balls

reasonably relied on those documents, or that the Mays intended to deceive the Balls with respect

to those documents.

### 2. Tile's 2007 Tax Return

The Balls contend that Tile's 2007 tax return was materially false because it misrepresented

profits. But this assertion does not involve bad debts. Instead, it concerns the alleged improper

allocation of business expenses between Tile and Granite in order to make Tile appear more

profitable. In particular, the Balls focus on the division of rent expenses between the companies.[71]

---

[71] In their Rule 52(c) brief, the Balls raise for the first time the argument that costs of goods sold were not proportional between Tile's and Granite's 2007 tax returns. The Balls do not make clear why there must be proportionality between the companies' tax returns. In any event, the Balls did not present any evidence on this issue at trial.

In 2006, Tile deducted $105,000 for rent on its tax return.[72] In 2007, Tile's rent deduction dropped to $18,000,[73] while Granite claimed a $157,000 deduction for rent.[74]

The evidence does not show that Tile's 2007 tax return was false. The Plaintiffs established that Tile and Granite shared expenses,[75] but they produced no evidence to show that the apportionment of rent expenses was improper or that Tile and Granite did not actually incur these rent expenses in 2007. They simply rely on the fact that Tile's rent expense fell between 2006 and 2007 to imply that the reduction was a sham. But that reduction was the result of Russ Bradshaw's work to iron out any accounting inconsistencies in the books and records of Tile and Granite in connection with the preparation of their 2007 tax returns.[76] Bradshaw's testimony demonstrated that this work was done diligently and methodically so that Tile's 2007 tax return would be accurate and complete.[77]

Bradshaw's testimony also established that the Mays had no intent to deceive when they presented Tile's 2007 tax return to the Balls in connection with the sale. Tile's 2007 tax return was prepared by an accountant who attested that it was accurate and complete. The Balls produced no evidence to show that it did not accurately reflect Tile's financial condition. Presenting such a tax return to the Balls does not show evidence of fraudulent intent, but rather the opposite.

---

[72] Ex. 1.

[73] Ex. 2.

[74] Ex. 5.

[75] Trial Transcript for June 6, 2017, at 212:18-19.

[76] *Id.* at 309:18-310:9.

[77] *Id.* at 325:12-21.

Additionally, the Balls' reliance on the alleged misrepresentation of Tile's rent expenses was not reasonable. The Balls reviewed Tile's 2006 and 2007 returns. A simple comparison of these two returns clearly reveals the change in rent expenses, as well as wage expenses, from 2006 to 2007. This is exactly the type of information that a competent review of the returns would reveal. The Balls cannot claim they were misled about Tile's rent expenses when they had the information necessary to question those expenses before their eyes at the time they bought Tile.

### 3. Other Representations Regarding Tile's Financial Health and Bad Debts

There are two allegations that fall into this category of "other representations." The first is that the Mays, through Duane Bush, told the Balls that Tile had no serious collection issues. This representation is founded upon an email exchange between Brad Ball and Duane Bush. On July 17, 2008, Ball sent Bush an email wherein he asked questions about Tile's accounts receivable, including whether Tile had "any collections issues."[78] Bush responded the next day and said that while Tile has "no major issues on collections," he elaborated that Tile has "had bad debt from time to time, mostly when no one is paying attention to collections / who they give credit to. This is an area that can definitely be tightened up and Steve has said that."[79]

The Balls appear to take issue with the portion of Bush's statement that represented Tile had "no major issues on collections." The Court is uncertain whether the Balls allege that this statement is materially false because it is an affirmative misrepresentation or because Bush or the Mays did not

---

[78] Ex. 70.

[79] *Id.* Although Bush made this statement, Steve May gave him the information that Tile had "no major issues on collections." Trial Transcript for June 6, 2017, at 242:12-22. Therefore, the statement qualifies as a written statement for purposes of § 523(a)(2)(B) because it was "written by someone else but adopted and used by the debtor." *In re Kaspar*, 125 F.3d at 1361 (quoting 4 *Collier on Bankruptcy*, ¶ 523.08[2][a] (15th ed. 1997)).

disclose approximately $230,000 in unpaid accounts receivable from 2006.[80] As mentioned before, an omission from a written statement is not materially false for purposes of § 523(a)(2)(B) unless the party not disclosing the information had a duty to disclose it.[81] The Balls did not establish that Bush or the Mays had a duty to disclose the $230,000 in unpaid accounts receivable in that email exchange, so to the extent that the Balls argue that the statement is materially false because it omits any mention of the unpaid accounts receivable, such statement does not support a claim under § 523(a)(2)(B).

In order for Bush's statement to be an affirmative misrepresentation, the assertion that Tile has "no major issues on collections"—a qualitative statement—must be inconsistent with the fact that Tile had $230,000 in unpaid accounts receivable from 2006—a quantitative measurement. While there may appear to be a facial inconsistency, the Balls did not establish what "major issues on collections" would be in the context of this case or that the accounts in question were in fact "collection issues." They simply assumed that $230,000 in unpaid accounts receivable would constitute a major collection issue. As it turned out, the Inklyne credit involved a contract dispute, and there was no evidence that the other unpaid accounts and credits were "collection issues."

Even assuming, for the sake of argument, that $230,000 in unpaid accounts receivable would be a "collection issue" in the context of this case, the Balls have not shown that Bush's statement was materially false. Tile was marketed as a non-recurrent revenue business, which means that Tile

---

[80] The Court has referred to the $230,000 at issue as "unpaid accounts receivable" and, on occasion, as "bad debt" because that was the parties' usage. But there was no evidence that showed precisely whether this amount, or a portion of it, consisted of bad debt or unpaid accounts receivable. Instead, it appears that some portion of the $230,000 consisted of credits.

[81] *See supra* note 47 and accompanying text.

did not rely on a base of repeat customers, but instead had to find new clients on a regular basis to generate revenue.[82] Tile's success in collecting on its accounts receivable was determined, as Bush informed the Balls in his email, by its attentiveness to collections and the entities to whom it extended credit. As managers of Tile, the Balls would have control over both, but particularly the former. And unlike a recurrent revenue business that might have to deal with a frequently delinquent client, Tile's inability to collect on a particular invoice was not necessarily predictive of its ability to collect on invoices in the future since the clients would be different. Therefore, even though Bush told the Balls that Tile had occasional bad debt, the fact that he did not specifically disclose that Tile had $230,000 in unpaid accounts receivable from 2006 was not materially false. Tile's failure to collect on certain 2006 accounts receivable did not affect its ability to collect on accounts receivable going forward, and that ability lay within the control of Tile's purchaser—the Balls. Accordingly, the Balls cannot claim that two-year-old unpaid accounts receivable would normally affect the decision to purchase a non-recurrent revenue business.

In addition, the Balls have failed to establish that their reliance on Bush's statement was reasonable for the same reasons articulated in Section III.A.1, *supra*. In short, the Balls knew or should have known about Tile's unpaid accounts receivable because they knew about the Inklyne credit and reasonable investigation would have revealed the unpaid accounts receivable.

Last, neither the Mays nor Bush had an intent to deceive. Although the unpaid accounts receivable were incorrectly entered in Tile's general sales ledger, they were clearly included in that ledger and were not deleted. There is no evidence that the Mays attempted to delete that information, and the Court finds no inference of an intent to deceive.

---

[82] Trial Transcript for June 6, 2017, at 243:25-244:19.

The second alleged representation is that the Mays, either directly or through Bush, told the Balls that Tile's business was coming in at the same rate when they knew that Promontory, one of Tile's major accounts, had declared bankruptcy. The Balls allege that this representation was made in two ways: first, in oral statements made at meetings between the Balls and Mays, and second, in a document entitled Sales by Customer Summary,[83] which shows Tile's sales in January and February 2008 listed by customer. The Balls presented no credible evidence to establish that the Mays made an affirmative oral representation that business was coming in at the same rate as it previously had. Even if the Mays had made such an oral representation, as mentioned above, an oral statement respecting Tile's financial condition is not actionable under § 523(a)(2).[84] Additionally, the Balls never established that the Mays had a duty to disclose Promontory's bankruptcy. As a result, the failure to mention Promontory's bankruptcy also is not actionable under § 523(a)(2). That leaves Tile's customer summary as the remaining basis for the Plaintiffs' § 523(a)(2) claim.

The Balls appear to argue that the customer summary is an implied representation that Tile's business is remaining steady, which they allege is inconsistent with the fact that Promontory had filed bankruptcy.[85] They focus on a handwritten note on the customer summary that says, "Have

---

[83] Ex. 80.

[84] *See supra* note 40 and accompanying text.

[85] In this way, the customer summary could be viewed as a false pretense. *See Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (10th Cir. BAP 2013) ("False pretenses . . . are implied misrepresentations intended to create and foster a false impression. Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions."). False pretenses are actionable under § 523(a)(2)(A). Because the customer summary and whatever it implies concern Tile's overall financial health, however, it is only actionable under § 523(a)(2)(B).

approximately 1 million additional in jobs booked out thru the rest of 08!"[86] Duane Bush testified

that he wrote that note after he received that information from Steve May.[87] In addition to the

handwritten note, the customer summary shows that Tile had $194,658.36 in sales during the first

two months of 2008, of which $163,177.55 was attributable to Promontory.

But the Balls mischaracterize what the customer summary says. It does not make the express

representation that Tile's business was continuing at the same rate. The customer summary only says

that Tile had sales of $194,658.36 through the end of February 2008 and a note that anticipated about

$1 million more by the end of the year. It certainly does not state that Tile's business was continuing

at the same rate. To make that statement, there must necessarily be a comparison, but the Balls never

even attempted to establish a comparison benchmark. The Balls did not contest the accuracy of the

$194,658.36 sales figure through February 2008, and they neither argued nor produced any evidence

to show that the handwritten note was false. Promontory had not filed bankruptcy when the customer

summary was generated on February 29, 2008 and forwarded to Duane Bush. Critically, the Balls

did not show whether and to what extent Promontory's bankruptcy caused Tile to take in less than

the anticipated $1 million in additional jobs booked through the end of 2008. The Court concludes

that the customer summary does not make any representation comparing Tile's 2008 sales to its sales

in prior years. At bottom, the Balls have not proved that the Mays made a false statement on the

customer summary for two reasons. First, the customer summary does not state what the Balls

believe it does. Second, they have not shown that what it actually states is false.

---

[86] Ex. 80.

[87] Trial Transcript for June 6, 2017, at 202:11-23.

The Balls failed to establish that they reasonably relied on the customer summary when they decided to purchase Tile. First of all, the Balls' testimony that they relied on the customer summary is not credible. Although they deny seeing Tile's general sales ledger through July 2008 at the due diligence meeting, the Balls testified that they reviewed all of the invoices from January through July 2008 and saw a number of reports.[88] A review of all of Tile's invoices through July would have revealed two important things that are relevant here. First, reviewing those invoices would have shown Tile's actual sales through July, which would have given the Balls a more complete picture of Tile's sales than the customer summary. Second, a review of the invoices through July would have revealed that Promontory invoices stopped in April.[89] The fact that Promontory was no longer generating business for Tile was readily discernable from the information the Balls had before they bought Tile. It should have been glaringly obvious that an account that constituted 84% of Tile's sales in January and February 2008 had not generated a single invoice after April 23, 2008. In addition, the Balls' reliance on the customer summary was not reasonable for another reason. The Balls claim to have reviewed the customer summary, which only reflects sales through February 29, 2008.[90] When the Balls conducted their final due diligence in August 2008, either they verified sales from January through August as they claim, or they did not bother to verify those sales. If they verified the sales for those months, they did not rely on the February customer summary but rather

---

[88] Trial Transcript for June 5, 2017, at 176:9-12.

[89] The last invoice for Promontory on the general sales ledger is dated April 23, 2008. Ex. 66.

[90] Trial Transcript for June 5, 2017, at 44:22-25.

the confirmation of sales that did occur during those months. If they didn't bother to verify sales during those months, their reliance on a stale customer summary was not reasonable.

In addition, even if the omission of Promontory's bankruptcy was a false representation, the Court concludes that Promontory's bankruptcy was not material to the Balls' purchase of Tile. The Court does not find the Balls' repeated, self-serving statements that they would not have bought Tile had they known of Promontory's bankruptcy credible. Their testimony is belied by the entries in Brad Ball's journal. On August 20, 2008, two days after closing on the sale of Tile, Ball went to Park City with Steve May to visit a couple of job sites. He writes: "Apparently May's worked on a big luxury subdivision called Promontory just East [sic] of Park City but the whole thing went belly up a few months ago."[91] Ball does not express any astonishment or that he was defrauded or deceived, does not seek to unwind the sale, and does not mention Promontory again until about a month later, when he notes that he and Steve May headed up to the Promontory development.[92] But again, there is no statement that would even imply Brad Ball believed the Mays had wrongfully hidden Promontory's bankruptcy. Had Promontory's bankruptcy been as significant to the Balls as they now claim it was, one would expect to find statements in Brad Ball's journal decrying the Mays' concealment of that fact or noting the lack of sales to Promontory after the Balls purchased Tile. But nowhere in that journal, which records the minutiae of Ball's daily life in voluminous detail from July 2008 to May 2009, can the Court find such a statement. Instead, Ball mentions Promontory only twice and does so tersely and blandly. Accordingly, the Court concludes that the Mays' failure to

---

[91] Ex. 60, at August 20, 2008 entry.

[92] *Id.* at September 19, 2008 entry.

32

disclose Promontory's bankruptcy is not material because it did not affect the Balls' decision to purchase Tile.

Last, the Court concludes that the customer summary does not evince an intent to deceive. At the time it was prepared, the customer summary was accurate and Promontory had not filed bankruptcy. The actual sales through July 2008 exceeded $590,000, which is not inconsistent with the estimate of sales evidenced by Bush's handwritten note on the customer summary. Without evidence that Promontory's bankruptcy rendered any of the statements in the customer summary false at the time it was prepared, the Court cannot infer on these facts that the Mays intended to deceive the Balls by forwarding the customer summary to Bush. Since the Plaintiffs have not carried their burden under § 523(a)(2), the Court will enter judgment for the Defendants on this claim.

## B.    The § 523(a)(6) Claim

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[93] Because "willful" and "malicious" are joined in the conjunctive, a plaintiff must prove both to render a debt non-dischargeable under this provision.[94] The willfulness component requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."[95] A plaintiff must therefore prove that the debtor

---

[93] § 523(a)(6).

[94] *See Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004); *see also Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 655 (10th Cir. BAP 1999) ("Failure of a creditor to establish either willfulness or malice renders the debt dischargeable.").

[95] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *see also Penix v. Parra (In re Parra)*, 483 B.R. 752, 771 (Bankr. D.N.M. 2012) ("The 'willful' element requires both an intentional act and an intended harm; an intentional act that leads to harm is not sufficient.").

33

"desire[d] to cause the consequences of his act or believe[d] that the consequences [were] substantially certain to result from it."[96] The inquiry in this regard is subjective, focusing on the state of mind of the debtor.[97] "For a debtor's actions to be malicious, they have to be intentional, wrongful, and done without justification or excuse."[98] As a general rule, an intentional breach of contract by itself is "not the type of injury addressed by § 523(a)(6)."[99] To fall within § 523(a)(6), the breach must be willful and malicious.[100]

The Plaintiffs complain of six acts under this statutory provision. They allege that the Mays (1) locked the Balls out of the warehouse where Tile was located; (2) breached the Employee Lease by terminating it without 45 days' written notice; (3) converted Tile's sales orders; (4) caused Alex Mismash to leave Tile; (5) refused to allow the Balls to continue to use May's contractor's license; and (6) arranged a scheme to harm the Balls and their property. The common thread running through these alleged acts is their timing—they occurred in or around April and May 2009. The Balls' theory of their § 523(a)(6) claim is that the Mays engaged in these post-sale acts in an attempt to hamstring the Balls' operation of Tile and ultimately wrest control of the business from them.

---

[96] *Moore*, 357 F.3d at 1129 (quoting *Longley*, 235 B.R. at 657).

[97] *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, No. 99-3339, 2000 WL 1275614, at *3 (10th Cir. Sept. 8, 2000) (unpublished) ("When injury was 'neither desired nor in fact anticipated by the debtor,' it is outside the scope of the statute.").

[98] *Shirley v. Lopez (In re Lopez)*, 566 B.R. 255, 260 (Bankr. D.N.M. 2017).

[99] *Sierra Chems., LLC v. Mosley (In re Mosley)*, 501 B.R. 736, 744 (Bankr. D.N.M. 2013) (citation and internal quotation marks omitted).

[100] *See Sanders v. Vaughn (In re Sanders)*, No. 99-6396, 2000 WL 328135, at *2 (10th Cir. Mar. 29, 2000) (unpublished) ("[N]othing in *Geiger* indicates the Supreme Court's intention to immunize debtors under 11 U.S.C. § 523(a)(6) for 'willful and malicious' breaches of contract.").

34

With respect to the first act, the evidence showed that Steve May changed the locks to the warehouse where Tile and Granite were located on or around April 23, 2009. He did that because he came to distrust the Balls and did not want them to have access to his office—which shared space with Tile's office—after hours.[101] But the evidence was clear that May did not "lock the Balls out" because the building was open and accessible to the Balls during normal business hours. Therefore, the Balls' assertion that they were locked out of the business is a complete mischaracterization of the evidence. More importantly, however, the Plaintiffs presented no evidence that changing the locks affected their ability to conduct business in any way. Without such evidence, the Plaintiffs have not shown they suffered an injury based on the changing of the locks and therefore cannot maintain a § 523(a)(6) claim on that act.

The second and third acts are related. The Balls allege that the Mays stopped the sales employees—Jason Johns and Kristy Larsen—from continuing to fill orders for Tile without the requisite 45 days' notice, thereby breaching the Employee Lease. As a result, the Balls contend that the Mays took orders that should have gone to Tile and instead gave them to Granite. There is no dispute that Jack Reed, Tile's and Steve May's attorney, sent a letter dated May 22, 2009 to Spencer Ball, the Balls' attorney, that served as written notice of termination of the Employee Lease.[102] The Plaintiffs contend, however, that Johns and Larsen effectively stopped working for Tile about a month earlier.

The evidence on this point is contradictory, but ultimately does not support the Plaintiffs' version of events. David Ball testified that Marie Christiansen would invoice Brad Ball weekly

---

[101] Trial Transcript for June 7, 2017, at 498:22-25, 499:12-17.

[102] Ex. 116, at 5.

pursuant to the Employee Lease, but the invoices stopped for a period of about three weeks in late April through mid-May 2009.[103] The Plaintiffs argue that this shows Johns and Larsen were no longer working for Tile. The Defendants attempted to impeach this testimony by introducing three invoices from Granite to Tile, two of which relate to the Employee Lease. One is dated April 29, 2009 and requests one week's payment. The other is dated May 20, 2009 and requests payment for the three weeks beginning April 27, May 4, and May 11, 2009.[104] Both invoices have a fax date-stamp of May 22, 2009. David Ball testified, however, that he had never seen the April 29 invoice while working at Tile and only received the May 20 invoice after making a demand for one.[105] While the grouping of three weeks into a single invoice appears to be a departure from the parties' past practice, the fact that Ball demanded an invoice suggests that Johns and Larsen were still working for Tile, which contradicts his testimony that they were not.[106] In addition, the Plaintiffs allege that Steve May told Johns and Larsen that they were not to provide any more sales orders to Tile and the Balls. The Plaintiffs produced no evidence to substantiate this allegation and in fact elicited testimony to the contrary: Johns testified that May never asked him not to give orders to Tile or stopped him from giving orders to Tile.[107] Furthermore, May testified that he was not aware of Johns

---

[103] Trial Transcript for June 7, 2017, at 443:18-25, 448:17-22; Ex. AAA.

[104] Ex. AAA.

[105] Trial Transcript for June 7, 2017, at 411:12-24, 449:6-17.

[106] *See id.* at 398:17-19, 412:20.

[107] Trial Transcript for June 5, 2017, at 137:16-23, 138:18-19. The Balls did attempt to introduce a recording of a telephone conference to impeach Johns's testimony but the Court refused to receive the recording into evidence. The Balls' attorney contended that the recording was not previously disclosed because it was being used only for impeachment purposes. The Court concluded the Balls were seeking to introduce the recording to prove the truth of the matter. But as discussed herein, it does not matter whether May told Johns and Larsen to stop

36

and Larsen being taken away from Tile or Christiansen being told to stop invoicing Tile for their services.[108]

After weighing the evidence and assessing the credibility of the witnesses, the Court finds that May did not tell Johns and Larsen to stop providing orders to Tile. But even if he had, that would only establish a breach of the Employee Lease. That lease expressly provides that it can be terminated on 45 days' written notice, so the Balls knew termination was a possibility. But most importantly, the Plaintiffs failed to introduce any evidence showing that the Mays intended to injure them through an intentional termination of the Employee Lease. Accordingly, the second and third acts do not support a § 523(a)(6) claim.

As regards the fourth act, there was no evidence that the Mays caused Mismash to leave Tile. In fact, Mismash's own testimony was that David Ball called him and told him "there was no need to do anything anymore."[109] Therefore, the Plaintiffs have not shown a deliberate or intentional act on the Mays' part that caused Mismash to leave, much less the deliberate or intentional injury required by § 523(a)(6).

The fifth act the Balls complain of does not provide any support for their claim. The Asset Sale Agreement clearly provided that the Balls could continue to operate Tile under May's license for 60 days after the date of closing, but thereafter the Balls had to qualify for and obtain their own contractor's license. The term is self-effectuating. May was not required to give notice to the Balls that they could not use his contractor's license after the expiration of the 60-day period. The Balls

---

taking orders for the Balls because that would only establish a breach of contract.

[108] Trial Transcript for June 7, 2017, at 500:13-501:3.

[109] *Id.* at 115:15-21.

are the ones who failed to obtain a contractor's license, and any notice May did give that the Balls
had breached the Asset Sale Agreement cannot form a basis for this claim.

The Plaintiffs did not address the sixth act—the alleged scheme to harm the Balls and their
property—in their brief and they did not present any evidence to support the finding of a scheme.
The Court interprets this sixth act to be an aggregation of the prior five, and since those acts are
insufficient to support a claim under § 523(a)(6), the Court reaches the same conclusion about the
sixth. Accordingly, the Court concludes that the Plaintiffs have failed to carry their burden under
§ 523(a)(6) and will enter judgment for the Defendants on this claim.

## C.      The § 727(a)(2) Claim

Section 727(a)(2)(B) denies a debtor's discharge where "the debtor, with intent to hinder,
delay, or defraud a creditor or an officer of the estate charged with custody of property under this
title, has transferred, removed, destroyed, mutilated, or concealed . . . property of the estate, after the
date of the filing of the petition."[110] A plaintiff must prove four elements under this provision: "(1)
the debtor transferred, removed, destroyed, mutilated or concealed property; (2) belonging to the
estate; (3) post-petition; (4) intending to hinder, delay or defraud a creditor or officer of the estate."[111]

The Plaintiffs' § 727(a)(2) claim is premised on an alleged transfer of a majority interest in
Granite from Steve May to Bobbie May. Initially, the Court notes that Granite's tax returns show that
Bobbie May has always held a 50% ownership interest in Granite.[112] The Plaintiffs allege that Steve

---

[110] § 727(a)(2)(B).

[111] *McVay v. DiGesualdo (In re DiGesualdo)*, 463 B.R. 503, 519 (Bankr. D. Colo. 2011)
(citation and internal quotation marks omitted).

[112] *See* Exs. 5-10.

38

May transferred a majority interest in Granite to hinder their efforts in collecting on a judgment that may be entered by this Court. In support of this allegation, the Plaintiffs introduced two documents: Granite's articles of organization, filed on May 3, 2002, and a document purporting to be a record from the Utah Department of Commerce.[113] The latter document is dated July 18, 2014—which is post-petition—and is a summary of online changes made to Granite's file at the Department of Commerce. There are four changes, which are labeled "new information": (1) Steve May's address as a registered agent was updated; (2) Bobbie May was added as a manager; (3) Stacy May, the Mays' son, was added as a manager; and (4) Steve May was added as a member.

The Plaintiffs attempted to characterize these changes as effecting a transfer of ownership in Granite, but none of this information shows any transfer of an ownership interest in Granite from Steve May to Bobbie May or Stacy May. Granite was organized under the Utah Revised Limited Liability Company Act.[114] Under that Act, a manger was defined as "a person elected or otherwise designated by the members to manage a manager-managed company."[115] By contrast, a member was "a person with an ownership interest in a company."[116] Granite was formed as a manger-managed limited liability company, and in such a company, "unless otherwise provided in the articles of organization or operating agreement of the company . . . *a manager need not be a member of the*

---

[113] Ex. 107. The Defendants objected to this exhibit because it was not a certified copy of a public record, but the Court eventually received the exhibit after an extended colloquy with Plaintiffs' counsel. Trial Transcript for June 7, 2017, at 466:12-474:15.

[114] Utah Code Ann. § 48-2c-100 *et seq.* The Utah Revised Limited Liability Company Act was repealed on January 1, 2016, Utah Code Ann. § 63I-2-248, but was in effect at all times relevant to this case.

[115] Utah Code Ann. § 48-2c-103(12) (2015).

[116] *Id.* at § 48-2c-103(14) (2015).

*company*."[117] Granite's articles of organization do not provide that a manager must be a member. Therefore, adding Bobbie and Stacy May as managers in 2014 is not evidence of a transfer of ownership interests in Granite. In addition, Steve May testified that he did not give Bobbie or Stacy May an ownership interest in Granite at the time these changes were made to Granite's file at the Department of Commerce.[118] The Plaintiffs failed to produce evidence of a transfer of property of the estate and therefore did not prove the first element of a § 727(a)(2) claim. There was also no evidence of an intent to hinder, delay, or defraud the Balls. Accordingly, the Court will enter judgment for the Defendants on that claim.

## D.       The § 727(a)(3) Claim

Section 727(a)(3) denies a debtor's discharge where "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information . . . from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."[119] "In order to state a prima facie case under § 727(a)(3), a plaintiff must show that the debtor 'failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his financial condition and *material business* transactions.'"[120] When debtors run a business, as the Mays do, they have "a duty to

---

[117] *Id.* at § 48-2c-804(6)(d) (2015) (emphasis added).

[118] Trial Transcript for June 7, 2017, at 464:8-10.

[119] § 727(a)(3).

[120] *Hunt v. Steffensen (In re Steffensen)*, 534 B.R. 180, 196-97 (Bankr. D. Utah 2015) (quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997)), *aff'd* 567 B.R. 188 (D. Utah 2016); *see also Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992) ("The test is whether there is available written evidence made and preserved from which the present financial condition of the bankrupt and his business transactions for a reasonable period

maintain records in a manner consistent with what is normally expected of businesses of the same complexity."[121] Intent is not an element of a § 727(a)(3) claim.[122] If a plaintiff states a prima facie case, then the "burden shifts to the debtor to justify his failure to keep and preserve adequate records."[123]

The Plaintiffs' § 727(a)(3) claim is predicated on the alleged falsification of documents, but there appears to be some inconsistency regarding which documents have been falsified. In their brief opposing the Defendants' Rule 52(c) motion, the Plaintiffs suggest that the Mays falsified their bankruptcy schedules, particularly their income, the value of Granite, and the value of two notes payable from Granite. But § 727(a)(3) does not deal with making false statements on one's bankruptcy schedules;[124] that is the province of § 727(a)(4). The Plaintiffs imply as much in their brief, but it appears that they tried to shoehorn these allegations into § 727(a)(3) so that they would not have to prove the Mays' intent under § 727(a)(4).[125] If falsification of bankruptcy schedules were actionable under § 727(a)(3), that would largely turn § 727(a)(4)(A) into a dead letter, since few plaintiffs would go to the trouble of proving intent. Congress typically does not draft statutes in such

---

in the past may be ascertained.").

[121] *Jacobowitz v. Cadle Co. (In re Jacobowitz)*, 309 B.R. 429, 436 (S.D.N.Y. 2004) (citations omitted).

[122] *In re Steffensen*, 534 B.R. at 197.

[123] *Id.* (citing *Brown*, 108 F.3d at 1295).

[124] *Spencer v. Blanchard (In re Blanchard)*, 201 B.R. 108, 127-28 (Bankr. E.D. Pa. 1996) ("[Section] 727(a)(3) . . . cannot be invoked to challenge inaccuracies in a debtor's Schedules and Statement.").

[125] *See* Docket No. 150, at 15 ("This falsified information is more fully set forth and analyzed below in the discussion concerning § 727(a)(4) False Oath—except here with § 727(a)(3), there is no scienter element.").

a way that one provision plainly and obviously renders another nugatory. Therefore, to the extent that the Plaintiffs base their § 727(a)(3) claim on the Mays' alleged falsification of their bankruptcy schedules, such claim fails as a matter of law.

In the amended complaint, however, the Plaintiffs allege that the Mays falsified a different set of documents, namely the books and records of Tile and Granite. But the Plaintiffs did not produce any evidence that showed the Mays falsified the books and records of Tile or Granite. To be sure, there were bookkeeping errors. Russ Bradshaw testified that Tile's QuickBooks records were in average to slightly worse than average condition, although that was not unusual for a business of that size.[126] He also testified that Marie Christiansen had a "very limited knowledge of basic accounting,"[127] and she made a mistake in posting unpaid accounts receivable from 2006 and 2007 to Tile's 2008 general sales ledger. But the evidence did not show falsification.

Moreover, the Plaintiffs failed to show that Tile's and Granite's records were insufficient to ascertain the Mays' financial condition and material business transactions. To the contrary, the evidence showed that Tile and Granite kept records commensurate with businesses of like complexity. Because the Plaintiffs did not make a prima facie case on their § 727(a)(3) claim, the Court will enter judgment for the Defendants on that claim.

## E.     The § 727(a)(4) Claim

Section 727(a)(4)(A) denies a debtor's discharge where "the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account."[128] To prevail on such

---

[126] Trial Transcript for June 6, 2017, at 311:11-19.

[127] *Id.* at 311:1-2.

[128] § 727(a)(4)(A).

a claim, the plaintiff must demonstrate "that the debtor knowingly and fraudulently made [a false] oath and that the oath relates to a material fact."[129] A fact is material "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."[130] Section 727(a)(4) requires a showing of intent, and "[a] debtor's intent to defraud or deceive can be proven by evidence of either (1) the debtor's actual intent to deceive or (2) reckless disregard for the truth."[131] But intent "will not be found in cases of ignorance or carelessness,"[132] and "an honest error or mere inaccuracy is not a proper basis for denial of discharge."[133] Statements and omissions on a debtor's schedules or statement of financial affairs count as oaths for purposes of § 727(a)(4)(A).[134]

The Plaintiffs' § 727(a)(4)(A) claim focuses on four alleged inaccuracies in the Mays' schedules: (1) the Mays' income, (2) the value of Granite, (3) the value of May's Properties, and (4) the value of two notes payable from Granite. The Mays' Schedule I lists $1,723 in Social Security for Steve May and $3,000 in regular income for Bobbie May for total monthly income of $4,723. On their Schedule B, the Mays listed ownership interests in Granite and May's Properties, which

---

[129] *In re Brown*, 108 F.3d at 1294.

[130] *U.S. Trustee v. Garland (In re Garland)*, 417 B.R. 805, 814 (10th Cir. BAP 2009) (citation omitted).

[131] *Gobindram v. Bank of India*, 538 B.R. 629, 637 (E.D.N.Y. 2015).

[132] *Id.* (citation and internal quotation marks omitted).

[133] *In re Brown*, 108 F.3d at 1295; *see also Cole Taylor Bank v. Yonkers (In re Yonkers)*, 219 B.R. 227, 233 (Bankr. N.D. Ill. 1997) ("[M]ere negligence is not sufficient to deny [a] discharge to debtors. A discharge will not be denied if the debtor made the false oath inadvertently, carelessly, or under a mistaken belief.") (citation omitted).

[134] *E.g.*, *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

they each valued at $0. They elaborated that Granite "has negative net worth of $522,098 as of April 1, 2013," and May's Properties "owns land that is fully encumbered," so "[t]here is no market for Debtors' interests."[135] The Mays also listed an interest in two notes payable from Granite, which they valued at $0. They stated that the face value of the notes was $165,496.65, but that because Granite "has negative net worth of $522,098.40," the "notes are worthless."[136]

The Plaintiffs did not establish that these statements were false. Regarding the Mays' income, the Plaintiffs' assert that the Mays omitted payments they were receiving on the notes payable from Granite. In particular, the Plaintiffs contend, based on Granite's balance sheets, that the Mays received approximately $30,000 on those notes from December 2012 to May 2013. Granite's balance sheet dated December 31, 2012 lists, under Long Term Liabilities, a "Note Payable—Steve & Bobbie May" with a balance of $98,563.21 and a "Note Payable—Steve May HELOC-39" with a balance of $82,933.44.[137] On Granite's balance sheet dated May 31, 2013, the first note had been reduced to $70,948.21 and the second to $81,233.44.[138] The balance sheets therefore do show a $29,315 reduction in the balance of the notes during that time period. And the Plaintiffs elicited testimony from Steve May that this reduction was attributable to Granite making payments to the Mays on those notes.[139]

---

[135] Ex. 44, at 6.

[136] *Id.*

[137] Ex. 42, at MA 005.

[138] Ex. 43, at MA 012.

[139] Trial Transcript for June 7, 2017, at 512:7-10.

44

But the Plaintiffs did not show by a preponderance of the evidence that the Mays' Schedule I was false. At most, the Plaintiffs established that the Mays had received nearly $30,000 on the notes payable at some point between December 31, 2012 and May 31, 2013. The Mays filed bankruptcy on April 12, 2013. The Plaintiffs simply presume that because the later balance sheet is dated after the Mays filed bankruptcy, they must have received payments on the notes post-petition. But there was no evidence presented that the payments on the notes occurred after the petition date or continued thereafter. In fact, Steve May testified that he did not continue to receive payments on the notes.[140] Schedule I documents a debtor's current income going forward from the time the debtor files bankruptcy.[141] This distinguishes it from Form 22C, which records a debtor's historical income for the six-month period preceding the bankruptcy case. The two forms catalogue distinct information, and at the time the Mays filed bankruptcy, Schedule I expressly stated that the "average monthly income calculated on this form may differ from the current monthly income calculated on Form 22A, 22B, or 22C." Because the Plaintiffs did not show that the payments on the notes constituted current income that should be listed on Schedule I, the Court concludes that the Mays did not make a false oath on their Schedule I.

With respect to the valuation of Granite, the Mays based the -$522,098 figure on the balance sheet that the Mays' CPA prepared for Granite as of April 1, 2013.[142] The Plaintiffs failed to challenge the accuracy of this valuation, and even their own expert, Brandon Ball, acknowledged that

---

[140] *Id.* at 514:1-3.

[141] *E.g.*, *In re Goble*, 401 B.R. 261, 267 (Bankr. S.D. Ohio 2009).

[142] *See* Ex. C; Trial Transcript for June 8, 2017, at 561:20-562:24. The balance sheet shows total equity of -$522,098.40 in Granite.

the book value of Granite was approximately -$500,000.[143] The Plaintiffs did challenge, however, whether book value was the appropriate method to use in valuing Granite, arguing that the Mays should have used fair market value instead. For that proposition, the Plaintiffs rely on § 522(a)(2), which defines value as "fair market value as of the date of the filing of the petition."[144] But that argument misses the mark—that definition of value applies only within the confines of § 522.[145] More fundamentally, the Court fails to see how the Mays' use of book value, properly explained, suffices to show a false oath. Based on the evidence presented at trial, the Mays' valuation of Granite was accurate according to the method used. And that negative value supports the Mays placing a value of $0 on their interest in Granite on their Schedule B. Accordingly, the Plaintiffs have not shown that the Mays made a false oath in their valuation of Granite.

As regards the valuation of May's Properties, the Plaintiffs contend that it could not have been worth $0 because its major asset, a warehouse, sold for $760,000 in September 2013, and the Mays received $277,000 in cash from the sale and used it to pay down a loan taken out by Granite. Again, the Plaintiffs mischaracterize the evidence. Of the $760,000 sales price for the warehouse, $677,374.94 went to Bank of Utah, with the balance going to satisfy closing costs, taxes, and utility assessments.[146] And of the amount that was paid to Bank of Utah, $398,468.13 paid off a mortgage

---

[143] Trial Transcript for June 6, 2017, at 373:24-374-2.

[144] § 522(a)(2).

[145] *See* § 522(a) ("***In this section*** . . . (2) 'value' means fair market value . . . .") (emphasis added).

[146] Ex. 47.

Bank of Utah had on the property,[147] and $277,055.60 paid down a loan taken out by Granite.[148] The Plaintiffs produced no evidence whatsoever evincing that the Mays received $277,055.60. To the contrary, the settlement statement for the sale of the warehouse shows that Bank of Utah received nearly all of the sale proceeds. That is entirely consistent with the representation the Mays made on their Schedule B that May's Properties owned fully-encumbered property that had no equity. Therefore, the Plaintiffs have not carried their burden to show that the valuation attached to May's Properties was a false oath.

Concerning the value of the notes payable, the Plaintiffs assert that the notes could not have been worth $0 when the Mays had received nearly $30,000 in payments on those notes. The Plaintiffs focus on the $0 valuation while ignoring the explanation the Mays gave for that figure. The Mays disclosed on Schedule B that the notes had a face value of $165,496.65, but because Granite had a negative net worth, the notes were worthless. Steve May further explained at trial that he valued the notes at $0 because if he no longer had an interest in Granite, the notes would not be worth anything.[149] The Mays clearly disclosed the notes' face value and provided an adequate explanation for why they valued the notes at $0. The Court concludes that the Mays did not make a false oath with respect to the notes payable.

In addition, the Plaintiffs failed to establish that the Mays made these four statements with intent to deceive. In the first place, it is difficult to infer fraudulent intent when the Defendants have not made a false oath. Moreover, the record shows that the Mays were forthcoming and transparent

---

[147] Ex. 50, Trial Transcript for June 7, 2017, at 523:22-524:24.

[148] Ex. 51.

[149] Trial Transcript for June 8, 2017, at 566:5-13.

on their schedules. They disclosed their interests in Granite, May's Properties, and the notes payable. And they explained the bases for their valuation of those assets, which was supported by the evidence. If the Mays erred on their schedules, the Court concludes that it was at most an honest mistake, which falls short of the intent required under § 727(a)(4). Accordingly, because the Plaintiffs have not carried their burden to show a false oath or the requisite intent, the Court will enter judgment for the Defendants on the § 727(a)(4) claim.

## F.      The § 727(a)(5) Claim

Section 727(a)(5) denies a debtor's discharge where "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."[150] To prevail under this provision, a plaintiff must "prov[e] facts establishing that a loss or shrinkage of assets actually occurred."[151] A decline in the value of an asset may serve as the basis for a § 727(a)(5) claim.[152] But the plaintiff "must introduce more than merely an allegation that the debtor has failed to explain losses. The plaintiff must produce some evidence of the asset losses."[153] Under § 727(a)(5), "it is unnecessary for the party objecting to discharge to prove or even allege fraudulent acts or a corrupt motive on the part

---

[150] § 727(a)(5).

[151] *Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 618 (10th Cir. BAP 2001).

[152] *See Chem. Bank v. Hecht (In re Hecht)*, 237 B.R. 7, 11 (Bankr. D. Conn. 1999) (denying debtors' discharge in part because they "offered no records and no credible explanation for the loss of the value of the defendants' interest in their business").

[153] *Carter Eng'g Co. v. Carter (In re Carter)*, 236 B.R. 173, 180 (Bankr. E.D. Pa. 1999).

of the debtor."[154] If the plaintiff carries this burden, "the burden then shifts to the debtor to explain the loss or deficiency of assets in a satisfactory manner."[155]

The Plaintiffs' § 727(a)(5) claim alleges that the Mays cannot satisfactorily explain the decline in value of two assets: Granite and the notes payable from Granite. With respect to Granite, the Plaintiffs contend that there is no explanation for the difference between its $3,000,000 valuation on a personal financial statement in 2006 and its -$522,098 valuation on the Mays' schedules in 2013.[156] The Court concludes that the Plaintiffs have failed to make a prima facie case based on the valuation of Granite. The Mays valued Granite on their schedules according to its book value, which is based on Granite's CPA-prepared balance sheet as of April 1, 2013.[157] But the Plaintiffs did not establish what method of valuation the Mays used on the personal financial statement in 2006 or what that value is based on, so the Court cannot determine whether comparing the 2006 value to the 2013 value is an apples-to-apples comparison.

But even if the Plaintiffs had made a prima facie case, the Court concludes that the Mays provided a satisfactory explanation for the difference in value. The Great Recession hit Granite hard, reducing its business by 50% in 2008.[158] In addition, the Mays cashed life insurance policies and all

---

[154] *McVay v. Phouminh (In re Phouminh)*, 339 B.R. 231, 247 (Bankr. D. Colo. 2005).

[155] *In re Stewart*, 263 B.R. at 618.

[156] In fact, the Plaintiffs claim, without evidentiary support, that Granite should have been worth at least $1,740,000 in 2013. They base this claim on the fact that Granite had gross sales of $1,404,000 in 2013, which was 58% of its gross sales in 2006. The Plaintiffs then multiplied $3,000,000 by .58 to arrive at a value of $1,740,000. The Plaintiffs failed to explain why that back-of-the-envelope calculation is an appropriate or accurate method to value a business.

[157] *See* Ex. C; Trial Transcript for June 8, 2017, at 561:20-562:24.

[158] Trial Transcript for June 8, 2017, at 556:25-557:2.

of their retirement funds, took out a second mortgage on their home, and maxed out their credit cards, all in an effort to keep Granite afloat.[159] Although a typical § 727(a)(5) claim involves "a discrepancy between a prepetition financial statement of the debtor and the debtor's bankruptcy schedules,"[160] which are the facts of this case, that provision is concerned with the hiding or siphoning of assets. So, for example, a loss in value of a debtor's company would be troubling because it might indicate that the debtor has sold inventory or equipment without accounting for it or has raided the company's coffers for his personal gain. Those, however, are not the facts of this case. The evidence is clear that Granite was struggling to weather the most severe economic downturn since the Great Depression, but rather than take from the company or sell its assets, the Mays ploughed their own assets into Granite. There was no loss of assets here. Granite did not lose value because the Mays drained its assets; it lost value simply because of the market forces in effect from 2006 to 2013.

The Plaintiffs also failed to make a prima facie case with respect to the two notes payable. The Mays' Schedule B lists the notes' face value as $165,496.65, but explains that because Granite has a negative net worth of $522,098, the notes are worthless and have a current value of $0. The Plaintiffs view this difference between the face value and the current value as an unexplained loss of assets. They are mistaken. The difference is simply due to how the Mays believed the notes would be valued in a bankruptcy case.[161] The Plaintiffs have provided no evidence of an actual loss or shrinkage of assets with respect to the notes, but instead have seized upon the Defendants' valuation

---

[159] *Id.* at 559:1-560:5.

[160] *Krohn v. Cromer (In re Cromer)*, 214 B.R. 86, 95 (Bankr. E.D.N.Y. 1997).

[161] *See* Trial Transcript for June 8, 2017, at 566:5-13.

methods in an attempt to deny them a discharge. Because the Plaintiffs have failed to carry their

burden under § 727(a)(5), the Court will enter judgment for the Defendants on this claim.


### IV. CONCLUSION

On the precipice of the worst financial crisis the United States had seen since the Great

Depression, the Balls bought a business in an industry they knew nothing about. About six months

later, with cash flow drying up and stress mounting, Brad Ball wanted to get out and move on to

something else and developed an "exit strategy." In this lawsuit, the Balls have laid the blame for

Tile's failure at the Mays' feet, arguing that the Mays sold them a business whose profits had been

fraudulently inflated and then undermined their efforts to conduct that business. The evidence

supports neither allegation. The evidence also does not support any of the Plaintiffs' claims under

§ 727(a). Because the Plaintiffs have not carried their burden on any of their claims, the Court will

grant the Defendants' motion under Rule 52(c). A separate Order and Judgment will be entered in

accordance with this Memorandum Decision.

_____END OF DOCUMENT_____

_____ooo0ooo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing **MEMORANDUM DECISION** shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

| | |
|---|---|
| J. Spencer Ball | spencer@spencerball.com |
| Jack W. Reed | Jack-Reed@rbmn.com, anna-collins@rbmn.com |
| R. Steven Chambers | steve@schamberslaw.com |

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

• None.